UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LUMBERMENS MUTUAL CASUALTY
COMPANY,

                              Plaintiff,                    5:08–CV–865 (LEAD)

              -v-


FLOW INTERNATIONAL CORPORATION;
FLOW AUTOCLAVE SYSTEMS, INC.; FLOW
PRESSURE SYSTEMS; ABB PRESSURE
SYSTEMS; AVURE TECHNOLOGIES AB;
and AVURE TECHNOLOGIES, INC.,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

FLOW AUTOCLAVE SYSTEMS, INC.; FLOW
PRESSURE SYSTEMS; ABB PRESSURE
SYSTEMS; AVURE TECHNOLOGIES AB;
and AVURE TECHNOLOGIES, INC.,

                              Plaintiffs,                   5:08–CV–915 (MEMBER)

              -v-

LUMBERMENS MUTUAL CASUALTY
COMPANY and KEMPER INSURANCE
COMPANIES,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                              OF COUNSEL:

HAVKINS ROSENFELD RITZERT &               ABRAHAM E. HAVKINS, ESQ.
    VARRIALE, LLP                         GREGG S. SCHARAGA, ESQ.
Attorneys for Lumbermens Mutual           STEVEN H. ROSENFELD, ESQ.
    Casualty Company & Kemper
    Insurance Company
1065 Avenue of the Americas, Suite 800
New York, NY 10018


COSTELLO, COONEY, & FEARON, PLLC          SHELLY L. DIBENEDETTO, ESQ.
Attorneys for Flow International Corporation,   ROBERT J. SMITH, ESQ.
    Flow Autoclave Systems, Inc., Flow
    Pressure Systems, ABB Pressure Systems,
    Avure Technologies AB, & Avure
    Technologies, Inc.
500 Plum Street, Suite 300
Syracuse, NY 13204


DAVID N. HURD
United States District Judge

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 5 -

FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 7 -

    Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 7 -

        Lumbermens and Kemper. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 7 -

        Travelers, Zurich, and Crucible. . . . . . . . . . . . . . . . . . . . . . . . . . - 8 -

        Flow International.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 8 -

        ABB Pressure Systems. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 8 -

        Flow Pressure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 8 -

        ABB Autoclave Systems, Inc.. . . . . . . . . . . . . . . . . . . . . . . . . . . - 9 -

        Flow Autoclave.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 9 -

        Avure Technologies AB and Avure Technologies, Inc.. . . . . . . . . . - 11 -

        Quintus Holdings, LLC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 11 -

    Relevant Insurance Policies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 12 -

        Zurich and Travelers Policies.. . . . . . . . . . . . . . . . . . . . . . . . . . - 12 -

        Federal Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 12 -

            Insureds. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 12 -

            Definitions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 12 -

            Exclusions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 13 -

        Lumbermens Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 13 -

            Insureds. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 13 -

            Coverage Parts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 13 -

            Definitions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 14 -

            Professional Liability Exclusion. . . . . . . . . . . . . . . . . . . . . . . . - 15 -

            "Your Product" and "Your Work" Exclusions. . . . . . . . . . . . . - 16 -

            "Your Work" Exclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 16 -

            Cooperation Requirement. . . . . . . . . . . . . . . . . . . . . . . . . . . - 17 -

    Crucible Incident. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 17 -

    Underlying Lawsuits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 17 -

    Letters Concerning Lumbermens' Coverage Position. . . . . . . . . . . . . . . - 18 -

    Quintus Purchase–Sale Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . - 21 -

Settlement of Underlying Actions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 21 -

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 22 -

    Legal Standard—Motion for Summary Judgment. . . . . . . . . . . . . . . . . . - 22 -

    Choice of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 23 -

        Waiver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 24 -

        Identifying a Conflict.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 24 -

    Plaintiff's Motion for Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . - 27 -

        First Cause of Action—Professional Liability Exclusion. . . . . . . . . . . . - 27 -

        Second Cause of Action—"Your Product" Exclusion. . . . . . . . . . . . . . - 31 -

        Equitable Estoppel.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 32 -

    Defendants' Motion for Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . - 36 -

        Flow International's Involvement. . . . . . . . . . . . . . . . . . . . . . . . . . . - 36 -

        First Cause of Action—Professional Liability Exclusion. . . . . . . . . . . . - 39 -

        Second, Third, and Fourth Causes of Action. . . . . . . . . . . . . . . . . . . - 39 -

        Fifth Cause of Action—Failure to Cooperate Provision. . . . . . . . . . . . . - 41 -

        Untimely Disclaimer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 42 -

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 43 -

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

Plaintiff Lumbermens Mutual Casualty Company ("Lumbermens" or "plaintiff") brings this declaratory action against defendant Flow International Corporation ("Flow International"); and defendants Flow Autoclave Systems, Inc. ("Flow Autoclave"), Flow Pressure Systems ("Flow Pressure"), ABB Pressure Systems, Avure Technologies AB, and Avure Technologies, Inc. (collectively the "Flow entities")[1] (collectively with Flow International, "defendants").[2]  Plaintiff filed the complaint in this case, Civil Action No. 5:08–CV–865 ("lead case") on August 13, 2008.  See Compl., Dkt. No. 1.

Lumbermens seeks a determination that there is no coverage for damages resulting from an allegedly negligently designed Pressurized Containment System ("PCS") based on the terms of a professional liability exclusion ("PLE").  Alternatively, it seeks a declaration that the "your product" exclusion applies to bar damages relating to the loss of the PCS itself.  Specifically, the complaint's five causes of action seek a declaration that no coverage exists:  (1) due to the PLE; (2) for claims arising out of the loss of the PCS; (3) for property damage caused by the Flow entities' work; (4) for claims arising out of the loss of intangible property, business interruption, or lost profits; and (5) due to defendants' failure to cooperate.

---

[1]  The complaint alleges the Flow entities were Flow International's alter ego and each were the same legal entity.  Plaintiff contends that at all times relevant to this action, Flow Autoclave, Flow Pressure, ABB Pressure Systems, Avure Technologies AB, and Avure Technologies, Inc. were owned by Flow International.  Defendants deny this and assert Flow International was a part minority owner of only some of the aforementioned entities.

[2]  Travelers Property Casualty Company of America ("Travelers"), Zurich American Insurance Company ("Zurich") as Subrogees of Crucible Materials Corporation, and Crucible Materials Corporation ("Crucible") were originally named as defendants but later voluntarily dismissed by stipulation.  See Dkt. No. 21.

On or about May 12, 2008 (prior to the filing of the instant action), the Flow entities—Flow Autoclave, Flow Pressure, ABB Pressure Systems, Avure Technologies AB, and Avure Technologies, Inc.—filed a summons and complaint in Supreme Court, County of Onondaga, against Lumbermens, Kemper Insurance Companies[3] ("Kemper"), Crucible, Travelers, and Zurich.  That complaint:  (1) alleges breach of contract based on Lumbermens and Kemper's duty to defend the underlying actions; (2) seeks a declaration as to the rights and obligations of the parties and a declaration that Lumbermens has an indemnification obligation in the underlying lawsuits; and (3) seeks attorneys' fees and disbursements resulting from the alleged breach of contract.  See Havkins Aff., Ex. 2, ¶ 1 ("member complaint").  On August 25, 2008, then-defendants Lumbermens and Kemper removed the member complaint to federal court.  That case, Civil Action No. 5:08–CV–915 ("member case") was assigned to the undersigned.  Lumbermens and Kemper answered the complaint in the member case.

A comparison of the two cases revealed they involve common questions of law and fact.  On June 1, 2009, the two cases were consolidated and Lumbermens v. Flow International, Civil Action No. 5:08–CV–865 was designated as the lead case.  See Order of Consolidation, Dkt. No. 13.[4]

On June 17, 2009, following consolidation, Flow International answered Lumbermens' complaint in the lead case.  See Dkt. No. 15.  On February 11, 2010, Lumbermens and Kemper filed an amended answer to the complaint in the member case

---

[3]  It appears Kemper's business name is Kemper Indemnity Insurance Company but it is reflected only as "Kemper Insurance Companies" on the docket.

[4]  All references to the docket are to the docket in the lead case, Lumbermens v. Flow International, 5:08–CV–865.

and asserted counterclaims against the Flow entities.[5]  The counterclaims seek a declaration that no coverage exists:  (1) due to the PLE; (2) for claims arising out of the loss of the PCS; (3) for property damage caused by the Flow entities' work; and (4) for claims arising out of the loss of intangible property, business interruption or lost profits.[6]

On March 25, 2011, plaintiff moved for summary judgment in the lead case pursuant to Federal Rule of Civil Procedure 56.  See Dkt. No. 34.  Defendants opposed and also moved for summary judgment in the lead case pursuant to Rule 56.  See Dkt. No. 37. Plaintiff opposed and both parties replied.  The motions for summary judgment were filed on the same day and thus will be treated as separate motions.  Oral argument was heard on June 24, 2011, in Utica, New York.  Decision was reserved.  There were no motions filed in the member case.

## II.  FACTUAL BACKGROUND

### A.  Parties

#### 1.  Lumbermens and Kemper

Lumbermens is an insurance company incorporated under the laws of the State of Illinois with its principle place of business in Illinois.[7]  Kemper is also incorporated under the laws of the State of Illinois.  Kemper is Lumbermens' parent corporation.[8]

---

[5]  The amended answer was filed only in the member case, Civil Action No. 5:08–CV–915.

[6]  Plaintiff's counterclaims in the member case are essentially the same as its claims in the lead case.

[7]  Lumbermens is no longer writing insurance.

[8]  In the deposition of John Leness ("Leness"), Secretary and General Counsel for Flow International, plaintiff's counsel explained that "Kemper is sort of a trade name, and Lumbermens was actually the insurer" but that the names are interchangeable for purposes of the deposition.  See Havkins Aff., Ex. 42, Dkt. No. 35-43, 8 ("Leness Dep.").

### 2.  **Travelers, Zurich, and Crucible**

Dismissed defendants Travelers and Zurich are both insurance companies.  Also previously dismissed, defendant Crucible is a corporation engaged in the specialty metals industry.  It owned and operated a steel manufacturing plant in Syracuse, New York.

### 3.  **Flow International**

According to plaintiff, Flow International is a Washington corporation with its principle place of business in that state.  Defendants admit Flow International is a corporation existing in the State of Washington, see Answer, Dkt. No. 15, ¶ 3, but assert it is a Delaware corporation, see Defs.' Resp. Statement of Material Facts, Dkt. No. 45–1, ¶ 1.  It should be noted that the Quintus Purchase–Sale Agreement describes Flow International as a Washington corporation.  See Havkins Aff., Ex. 19, Dkt. No. 35–20 ("Quintus Purchase–Sale Agreement").  Flow International is in the business of developing and manufacturing ultrahigh-pressure waterjet technology and provides robotics and assembly equipment.

### 4.  **ABB Pressure Systems**

According to defendants, ABB Pressure Systems was the previous name of the Swedish company Flow Pressure.  ABB Pressure Systems was a supplier to ABB Autoclave Systems.

### 5.  **Flow Pressure**

According to plaintiff, Flow Pressure was incorporated in the State of Washington and had its principal place of business in that state.  According to defendants, Flow Pressure was the name of the Swedish company that manufactured accumulator vessels and frames.

### 6.  **ABB Autoclave Systems, Inc.**

The record reflects that on September 30, 1986, ABB Industrial Systems, Inc. and Snap-Tite, Inc. formed a joint venture called ABB Autoclave Systems, Inc.  See Havkins Aff., Ex. 21, Dkt. No. 35–43 ("Joint Venture Agreement").  According to that agreement, ABB Industrial Systems, Inc. owned 51% of ABB Autoclave Systems, Inc. and Snap-Tite, Inc. owned the remaining 49%.

On November 1, 1998, Crucible entered into a Purchase–Sale Agreement with ABB Autoclave Systems, Inc.  See Havkins Aff., Ex. 18, Dkt. No. 35–19 ("Purchase–Sale Agreement").  Under the terms of that contract, ABB Autoclave Systems, Inc. agreed to design, manufacture, distribute, sell, install, and test a PCS (also referred to as a warm isostatic press) and related equipment at the cost of $3,654,000 to Crucible.  A portion of the work under the contract was subcontracted to Flow Pressure (formerly ABB Pressure Systems).  Flow Pressure manufactured some of the parts that were assembled into the PCS but ABB Autoclave Systems, Inc. was the end assembler of the PCS under the Purchase–Sale Agreement.

### 7.  **Flow Autoclave**

On March 31, 1999, several months after the execution of the Purchase–Sale Agreement, Flow International purchased ABB Industrial System, Inc.'s 51% interest in ABB Autoclave Systems, Inc..  Following that purchase, ABB Autoclave Systems, Inc. became known as Flow Autoclave.  As a result of the sale, Flow Autoclave became the entity responsible for the contractual relationship with Crucible under the Purchase–Sale Agreement.

At all relevant times, defendant Flow Autoclave's principle place of business was Colombus, Ohio.  See Toops Decl., Dkt. No. 45–2, ¶ 11.  The complaint indicates Flow Autoclave is incorporated in the State of Washington.  Compl., ¶ 4.  The Leness Declaration however asserts Flow Autoclave is a Delaware corporation, see Leness Decl., ¶ 9, yet the defendants' complaint in the member case indicates Flow Autoclave was incorporated in Ohio, see Member Compl., ¶ 1.  Flow Autoclave was in the business of manufacturing and distributing hot and cold isostatic presses for the uniform densification of advanced ceramics and alloy steel materials.

Plaintiff contends Flow International owned the Flow entities—Flow Autoclave, Flow Pressure, ABB Pressure Systems, Avure Technologies AB, and Avure Technologies, Inc..  However, according to defendants, "Flow International Corporation was a part minority owner of some of the [Flow] entities."  Defs.' Resp. Statement of Material Facts, ¶ 2.  Specifically, defendants contend Flow International was one of the owners of Flow Autoclave and owned 50% of its shares.  See Leness Decl., Dkt. No. 50–2, ¶ 9.

According to Jerry Toops ("Toops"), former President of Flow Autoclave, Flow Autoclave was a separate and distinct legal entity from Flow International.  It had its own Board of Directors and its financials were exclusive to it, with the owners each receiving 50% of the dividends paid.  See Toops Decl., ¶¶ 1–4.  According to Toops, Flow Autoclave paid an administrative fee to Flow International to obtain services such as insurance coverage and general legal services.  Id. ¶ 5.  He explained the services were not provided because Flow International controlled the day-to-day activities of Flow Autoclave but rather were a paid service.  Id.

Finally, after the explosion giving rise to this litigation, Flow Autoclave became Avure Autoclave Systems, Inc..

### 8.  Avure Technologies AB and Avure Technologies, Inc.

The complaint in the lead case indicates Avure Technologies AB is a Swedish corporation doing business in Washington.  The complaint in the member case asserts Avure Technologies AB exists under the laws of Sweden but does not indicate its place of business.  The member complaint indicates Flow Pressure and ABB Pressure Systems were both predecessors to Avure Technologies AB.

Lumbermens contends Avure Technologies, Inc. is a Delaware corporation doing business in Washington.  The Quintus Purchase–Sale Agreement states that Avure Technologies Inc. is a Washington corporation.  According to the member complaint, Avure Technologies, Inc. is the parent company to Flow Autoclave (which eventually became Avure Autoclave Systems, Inc.).

### 9.  Quintus Holdings, LLC

Quintus Holdings, LLC ("Quintus") is an affiliate of Gores Technology Group, LLC, a Los Angeles, California based private equity firm.  On September 30, 2005, Flow International sold its interests in Flow Autoclave, Avure Technologies, Inc., and Avure Technologies, AB to Quintus.[9]

---

[9]  The sale also included Flow International FPS AB and assets of Flow Holding Sagl, but those companies are not at issue here.

**B.  Relevant Insurance Policies**

**1.  Zurich and Travelers Policies**

At the time of the events giving rise to this lawsuit, Crucible was insured under two insurance policies that provided coverage for first-party property loss.  Zurich issued a Boiler and Machinery policy, number BM3734494–00, which provided coverage for the period December 1, 2001, through December 1, 2002 ("Zurich policy").  Travelers issued a standard property policy, number KTJ–CMB296T966–5–01, which provided coverage for the period December 1, 2001, through December 1, 2002 ("Travelers policy").

**2.  Federal Policy**

Flow International purchased a primary commercial general liability policy from Federal Insurance Company ("Federal"), with a $1,000,000 limit.  See Havkins Aff., Ex. 15, Dkt. No. 35–16 ("Federal policy").  The Federal policy, number 3579–41–30 SEA, provided coverage for the period April 1, 2002, through April 1, 2003.  It provided primary coverage for bodily injury or property damage caused by an occurrence up to a maximum of $1,000,000.

**a.  Insureds**

"Flow International Corporation, Inc." is the named insured on the Federal policy.  A named insured endorsement includes, among others, Flow International, Flow Pressure Systems FPS AB, Flow Autoclave, and Avure Technologies Inc..

**b.  Definitions**

The Federal policy includes almost identical definitions as those contained in the Lumbermens policy, described below.  Particularly relevant are the policy definitions for

"Property Damage," "Your product," and "Your work."

### c. Exclusions

The Federal policy provided general liability insurance coverage subject to exclusions.  The Federal policy excluded coverage for "property damage to your product arising out of it or any part of it" (the "your product" exclusion) and "property damage to your work arising out of it or any part of it and included in the products-completed operations hazard" (the "your work" exclusion).  Federal policy, 16.

### 3. Lumbermens Policy

Defendants also purchased an excess liability insurance policy from Lumbermens. See Havkins Aff., Ex. 14, Dkt. No. 35–15 ("Lumbermens policy").  The Lumbermens policy, number 9SX 123028–03, provided coverage for the period April 1, 2002, through April 1, 2003.  The Lumbermens policy provided $25,000,000 per occurrence in liability coverage, in excess of the Federal policy's $1,000,000 limit of insurance.

### a. Insureds

The declarations page of the Lumbermens policy lists "Flow International Corporation, et al" as the named insured, but Flow Autoclave, Flow Pressure, and Avure Technologies, Inc., among others, are also listed as named insureds.  Defendants ABB Pressure Systems, Avure Technologies AB, and ABB Autoclave Systems are not named insureds.

### b. Coverage Parts

The coverage provided by the Lumbermens policy is divided into two parts: Coverage Part A, "Excess Liability Over Underlying Insurance" and Coverage Part B, "Excess Liability Over Retained Limit."  Under Coverage Part A, coverage obligations arose

only when and if the limits of the underlying insurance (the Federal policy) were exhausted.

Under that part, Lumbermens would pay only damages in excess of the sum of damages that

would have been payable under the terms of the Federal policy.  Coverage Part A follows-

form to the terms and conditions of the Federal policy.  Under Coverage Part B, Lumbermens

would only pay damages covered under the terms of Lumbermens policy, but only if the

Federal policy did not apply.

Both Coverage Parts A and B contained exclusionary language.  Specifically, four

exclusions are at issue:  (1) a PLE[10]; (2) a "your product" exclusion; (3) a "your work"

exclusion; and (4) a provision requiring the insured to cooperate.

### c. Definitions

Also of significance is Section VI, containing the policy definitions.  According to

that section:

13.   "Property damage" means:
    a.          Physical injury to tangible property, including all resulting loss of
                 use of that property.  All such loss of use shall be deemed to occur
                 at the time of the physical injury that caused it; or
    b.          Loss of use of tangible property that is not physically injured.  All
                 such loss of use shall be deemed to occur at the time of the
                 "occurrence" that caused it.

* * *

17.   "Your product" means:
    a.          Any goods or products, other than real property, manufactured,
                 sold, handled, distributed or disposed of by:
          1)      You;
          2)      Others trading under your name;
          3)      A person or organization whose business or assets you
                 have acquired; and

---

[10]  The parties use the terms "professional liability" and "professional services" interchangeably throughout their motions.  For simplicity, only the terms "professional liability" and "PLE" will be used here.

b.    containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:
a.    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and
b.    The providing of or failure to provide warnings or instructions.

* * *

18.    "Your work" means:
a.    Work or operations performed by you or on your behalf; and
b.    Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:
a.    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and
b.    The providing of or failure to provide warnings or instructions.

### d.  <u>Professional Liability Exclusion</u>

Plaintiff's first cause of action seeks a declaration that no coverage exists due to the PLE.  Both Coverage Parts A and B contain the same provision regarding professional liability.  Coverage Part A contains this language by endorsement, while Coverage Part B contains this language as an exclusion.  The identical language in both parts provides in relevant part that the insurance does not apply to:

"Bodily injury," "property damage," "personal injury" or "advertising injury" due to the rendering or failure to render any professional service.  This includes but is not limited to:

1) Legal, accounting or advertising services;
2) Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications;
3) Supervisory, inspection or engineering services;

### e.  **"Your Product" and "Your Work" Exclusions**

The second cause of action seeks a declaration that no coverage exists for claims

arising out of the loss of the PCS itself.  This claim involves the following provisions in the

Lumbermens policy:

> EXCLUSIONS
> 3.    With respect to Coverage B only, this insurance does not apply to:
>>    k.       Damage to Your Product
>>             "Property damage" to "your product" arising out of it or any part of
>>             it.
>
>>    l.       Damage to Your Work
>>             "Property damage" to "your work" arising out of it or any part of it
>>             and included in the "products-completed operations hazard."
>
>>             This exclusion does not apply if the damaged work or the work out
>>             of which the damage arises was performed on your behalf by a
>>             subcontractor.

### f.  **"Your Work" Exclusion**

The third cause of action seeks a declaration that no coverage exists for property

damage caused by the defendants' work.  The Lumbermens policy contains the following

exclusion:

> EXCLUSIONS
> 1.    With respect to Coverage A and Coverage B, this insurance does not apply
>       to:
>>    c.       Damage to Property
>>             "Property damage" to:
>>             7)     That particular part of any property that must be restored,
>>                    repaired or replaced because 'your work' was incorrectly
>>                    performed on it.

### g. <u>Cooperation Requirement</u>

The fifth cause of action seeks a declaration that no coverage exists due to the defendants' failure to cooperate.  Section V of the Lumbermens policy contains Commercial Catastrophe Liability Conditions and states that the insurer has no duty to provide coverage unless the insured fully complies with the specified conditions.  Duties in the event of an occurrence, offense, claim, or suit include, inter alia, the duty to cooperate with Lumbermens in the investigation and settlement of any claim.  Further, if the insured becomes responsible for the investigation or settlement of any claim, the insured must use due diligence and sound judgment to settle all such claims.

### D. <u>Crucible Incident</u>

On June 28, 2002, there was an explosion at the Crucible plant.  It is undisputed a vessel, known as a PCS, exploded killing Crucible employee Tony Anthony, Jr. ("Anthony") and causing property damage to the plant.  The parties agree that the vessel misaligned which caused it to explode.  Experts however never determined what caused the misalignment.  According to plaintiff, a faulty design caused the misalignment.  Defendants dispute a defective design as the cause, and assert other defenses explained below.

Following the explosion, Crucible submitted a property damage claim to Travelers and Zurich seeking approximately $17,000,000 in insurance proceeds.  Ultimately, Crucible, Travelers, and Zurich settled the first-party insurance claim for $5,600,000.

### E. <u>Underlying Lawsuits</u>

As a result of the explosion at the Crucible plant, three civil actions were commenced.  <u>First</u>, on March 12, 2004, Anthony's estate commenced a wrongful death action against Flow Autoclave in the Northern District of New York (the "wrongful death

action").  <u>Second</u>, on April 12, 2005, Travelers and Zurich together commenced a

subrogation action in Supreme Court, Onondaga County against Flow Autoclave, Flow

Pressure, ABB Pressure Systems, Avure Technologies AB, and Avure Technologies, Inc. in

which they sought reimbursement of the insurance proceeds they paid to Crucible for

damages resulting from the June 28, 2002, explosion (the "subrogation action").  <u>Third</u>, on

April 26, 2005, Crucible commenced a property damage action in Supreme Court, Onondaga

County against Flow Autoclave in which Crucible sought to recover damages that were not

covered by the Travelers or Zurich policies (the "Crucible action") (collectively with the

subrogation action, the "property damage actions").  Notably, Flow International was not a

party to any of the underlying lawsuits.

The complaints in all three civil actions alleged the respective defendants were

negligent in designing and manufacturing a defective and unsafe PCS and breached their

duty to properly use engineering skills.  Specifically, the property damage actions asserted

the PCS design failed to incorporate an inexpensive safety switch that would have

automatically shut it down in the event of a misalignment in the accumulator vessel and thus

could have prevented the explosion.  In defense, the Flow entities argued the explosion may

have been caused by improper maintenance and repairs performed by Crucible or an

earthquake in the area immediately prior to the explosion.

Federal, the primary general liability insurer, initially provided a defense in all three

lawsuits, subject to a reservation of rights.

**F.  <u>Letters Concerning Lumbermens' Coverage Position</u>**

On September 17, 2004, Lumbermens issued a letter to Toops indicating it failed to

receive requested information from Flow International regarding claims by Crucible for

property damage and by Anthony's estate for wrongful death.[11]  See Havkins Aff., Ex. 8, Dkt. No. 35–9 ("September 17, 2004 letter").  The letter outlined Lumbermens' coverage position based on the limited information received at that point.  It indicated it had no coverage obligation under Coverage Part A because the limits of the underlying Federal policy had not yet been exhausted.  Despite that position, the letter noted several exclusions that may apply if a coverage obligation arose, including the "your product" exclusion and cooperation requirement.  With respect to Coverage Part B, the letter explained that based on the information received, the underlying insurance at least potentially applied and Federal had responded to provide coverage pursuant to a reservation of rights.  Notwithstanding Lumbermens' lack of obligation to respond because the Federal policy provided coverage, the letter indicated potential coverage defenses that may apply.

On May 16, 2005, Lumbermens issued a letter to Toops and Flow International's counsel, Robert J. Smith, Esq. ("Smith"), of Costello, Cooney, & Fearon, PLLC.  See Havkins Aff., Ex. 9, Dkt. No. 35–10 ("May 16, 2005 letter").  That letter acknowledged review of the subrogation complaint filed by Travelers and Zurich against Flow Autoclave.  Like its previous letter, Lumbermens noted it had no coverage obligation under Coverage Part A until the Federal policy was exhausted, which it was not.  It again cited potentially applicable exclusions including the "your product" exclusion and failure to cooperate provision.  The letter indicated, pursuant to Coverage Part B, that Lumbermens had received no information indicating Federal had denied coverage in the subrogation action and thus Lumbermens had

---

[11]  At the time of the September 17, 2004, letter, the wrongful death action had been brought on behalf of Anthony's estate.  The Crucible action had not yet been initiated, but Crucible had submitted an insurance claim for damages.

no obligation under Part B.  Nevertheless, the letter noted coverage may be excluded by the "your product" exclusion, PLE, and failure to cooperate provision, among others.

On July 11, 2006, Lumbermens issued another letter to Toops updating its coverage position in the subrogation action.  See Havkins Aff., Ex. 10, Dkt. No. 35–11 ("July 11, 2006 letter").  It indicated Lumbermens was on notice the Federal policy might be exhausted as a result of a potential settlement in the wrongful death action.  Accordingly, Lumbermens agreed to provide a defense in the subrogation action under Coverage Part A, subject to a reservation of rights.  Lumbermens continued to reserve the right to assert any of the coverage defenses set forth in the May 16, 2005, letter.  The letter also cited the PLE.

On December 21, 2006, plaintiff's current counsel Abraham E. Havkins of Havkins Rosenfeld Ritzert & Varriale, LLP issued a letter titled "Notice of Insurance Coverage Disclaimer and Reservation of Rights" to Toops and Smith.  See Havkins Aff., Ex. 11, Dkt. No. 35–12 ("December 21, 2006 letter").  Lumbermens agreed to defend the subrogation and Crucible actions under a reservation of rights as a result of the Federal policy limit's exhaustion following the wrongful death settlement.  The letter outlined Lumbermens' coverage position with respect to the property damage actions, citing potentially applicable policy exclusions.  The letter explained that certain claims in the property damage actions would be barred by the following provisions:[12]  (1) the PLE; (2) the policy definition of "property damage," precluding recovery for intangible property and lost profits among other things; (3) the "your work" exclusion; and (4) the "your product" exclusion, precluding compensation for the price of the PCS.

_____

[12]  Only the exclusions relevant to the instant motions are cited.

### G. Quintus Purchase–Sale Agreement

The sale of Flow Autoclave, Avure Technologies, Inc., and Avure Technologies, AB to Quintus followed on September 30, 2005.  See Quintus Purchase–Sale Agreement.  One of Flow International's objectives in selling the entities was to divest itself of non-core business.  As part of the sale, Flow International remained responsible to Quintus for any liabilities arising out of the Crucible explosion.  According to Leness, "[t]he sale was structured so that if anyone made a claim against the buyer (Quintus) for anything related to the Crucible explosion, Flow International would indemnify the buyer for such liability."  Leness Decl., ¶ 12.

### H. Settlement of Underlying Actions

On September 1, 2006, the wrongful death action was settled for $1,000,000.  As a result of the settlement, Federal's $1,000,000 policy limit was exhausted and it withdrew its defense in the subrogation and Crucible actions on October 2, 2006.  Via the December 21, 2006, letter Lumbermens agreed to provide coverage in the subrogation and Crucible actions, subject to a reservation of rights.  Thereafter, Lumbermens paid all expenses incurred in the defense of those actions.

On December 2, 2008, Lumbermens settled the subrogation action for $2,500,000 and the Crucible action for $850,000, for a total of $3,350,000.  The settlement terms were memorialized in a Release and Settlement Agreement which contained no admission of liability.[13]  See Havkins Aff., Ex. 30, Dkt. No. 35–31 ("Release and Settlement Agreement").

---

[13]  The Release and Settlement Agreement was entered into by and between Crucible, Travelers, Zurich, Flow Autoclave, Flow Pressure, ABB Pressure Systems, Avure Technologies AB, Avure Technologies, Inc., and Lumbermens (as a non-party excess insurer).  As Flow International was not a named defendant in the property damage actions, it was not named in the Release and Settlement

(continued...)

## III.  DISCUSSION

### A.  Legal Standard—Motion for Summary Judgment

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509–10 (1986).  All facts, inferences, and ambiguities must be viewed in a light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).

Initially, the burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56; Liberty Lobby, Inc., 477 U.S. at 250, 106 S. Ct. at 2511.  A fact is "material" if it "might affect the outcome of the suit under the governing law."  Anderson, 477 U.S. at 248, 106 S. Ct. at 2510; see also Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S. Ct. at 1356.  There must be sufficient evidence upon which a reasonable fact finder could return a verdict for the non-moving party.  Liberty Lobby, Inc., 477 U.S. at 248–49, 106 S. Ct. at 2510; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.

"When both sides have moved for summary judgment, each party's motion is examined on its own merits, and all reasonable inferences are drawn against the party

---

[13](...continued)
Agreement.

whose motion is under consideration."  Chandok v. Klessig, 632 F.3d 803, 812 (2d Cir. 2011).

### B. Choice of Law

At the outset, the parties disagree about what state law applies in this diversity action.  They agree New York's choice of law principles apply because New York is the forum state.  It should be noted that neither party has provided a complete choice of law analysis to determine which state law should apply to the claims in this case.[14]

Plaintiff argues Washington law applies because the most significant factor under New York's "grouping of contacts" test is the principal location of the insured risk.  Because the insured risk here is scattered over multiple states—Flow International has national and global operations—plaintiff asserts Flow International's home state of Washington is the dispositive choice of law factor.

In response, defendants contend:  (1) Lumbermens waived any choice of law argument because it chose the forum in 2008 and discovery has proceeded for three years under the assumption the law of the forum would apply; (2) plaintiff has not shown any conflict in the laws of New York and Washington; and (3) a proper choice of law analysis would lead to New York law based on New York's "grouping of contacts" and "center of gravity" analyses.  Finally, defendants argue the risk of inconsistent results as to the insured is serious because some defendants are located in Ohio and Sweden with no contact or

---

[14]   In its choice of law analysis, plaintiff immediately conducts the "grouping of contacts" test without first identifying whether there is an actual conflict between the laws of New York and Washington. Defendants note plaintiff's failure to show an actual conflict in the laws and argue "[n]otwithstanding the lack of any actual conflict, the choice of law analysis under New York law results in New York being the appropriate law."  Defs.' Mem. of Law in Opp'n, Dkt. No. 45, 6.  In reply, plaintiff asserts there is a conflict between New York and Washington law with respect to the PLE and estoppel.

domicile in Washington and thus three different laws would be applied.

## 1. **Waiver**

Defendants urge that Lumbermens waived the choice of law argument but have not provided any case law to support that assertion.  Defendants rely on Bombardier Capital, Inc. v. Richfield Housing Center, Inc., Nos. 91–CV–750, 91–CV–502, 1994 WL 118294, at *3 (N.D.N.Y. Mar. 21, 1994) (Munson, S.J.) for support.  That case involved a choice of law clause in a contract.  The Bombardier Court held that "'even where the parties include a choice of law clause in their contract, their conduct during litigation may indicate assent to the application of another state's law,' and the court may therefore disregard the clause and apply the law to which the parties have assented."  Id.  Bombardier is distinguishable; there are no choice of law clauses in the insurance policies at issue here and the parties have not proceeded entirely on the assumption that New York law applies.  To the contrary, plaintiff's mediation statement provided to defendants in May 2009 argued Washington substantive law governed the coverage issues.  Nor has the choice of law issue been briefed or decided prior to the instant motions.  Based on these facts, Lumbermens has not waived this argument and it is properly presented for review.

## 2. **Identifying a Conflict**

In New York, the threshold inquiry in a choice of law analysis is whether there is an actual conflict between the laws of the jurisdictions involved.  Schwartz v. Liberty Mut. Ins. Co., 539 F.3d 135, 151 (2d Cir. 2008).  An actual conflict of laws exists where there are "relevant substantive differences that could have a significant impact on the outcome of the case."  Finance One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 332 (2d Cir. 2005).  "If no conflict is found between the law of the forum and any other jurisdiction

whose law is invoked, then the Court should apply the law of the forum." <u>Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Pub. Co.</u>, 580 F. Supp. 2d 285, 290 (S.D.N.Y. 2008). Choice of law is decided on an issue by issue basis. <u>See</u> Restatement (Second) of Conflict of Laws § 145(1). A court cannot prospectively declare that a certain state's laws (here, either Washington or New York) applies to each and every issue in a case before the specific issue is identified.

First, with respect to professional liability exclusions, the Ninth Circuit using Washington law has adopted the definition of <u>Marx v. Hartford Accident & Indemnity Co.</u>, 183 Neb. 12, 14 (1968) regarding "professional services" in an insurance policy. <u>Evanston Ins. Co. v. Clark Cnty.</u>, No. C10–5625, 2011 WL 5563284, at * 4 (W.D. Wash. Nov. 14, 2011). Under that definition, "[a] 'professional' act or service is one arising out a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved in predominantly mental or intellectual, rather than physical or manual." <u>Id</u>. The focus must not be on the "title or character of the party performing the act, but to the act itself." <u>Id</u>.

Likewise, New York courts look "to the nature of the conduct under scrutiny rather than to the title or the position of those involved as well as to the underlying complaint." <u>Reliance Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh</u>, 262 A.D.2d 64, 65 (N.Y. App. Div. 1st Dep't 1999) (internal quotations and citation omitted). The pivotal issue is whether the acts or people under consideration involved "the special acumen and training of professionals when they engaged in the acts challenged." <u>Gen. Ins. Co. of Am. v. City of New York</u>, No. 04 Civ. 8946, 2005 WL 3535113, at *5 (S.D.N.Y. Dec. 23, 2005).

Courts in both New York and Washington recognize professional liability exclusions, and place emphasis on whether specialized training or skill is involved, rather than the title or character of those associated with the activity.  While Lumbermens notes that Washington courts interpret the scope of professional liability exclusions more broadly than New York courts, the states' laws do not have "relevant substantive differences that could have a significant impact on the outcome of the case."  Finance One Pub. Co. Ltd., 414 F.3d at 332.  Because there is no conflict, New York law will be applied.

Second, with respect to the "your product" and "your work" exclusions, New York and Washington courts are in accord and employ the same rational in interpreting such exclusions.  In New York, such exclusions "exist[ ] to exclude coverage for business risks, including claims that the insured's 'product or completed work was not that for which the damaged person bargained.'"  Basil Dev. Corp. v. Gen. Acc. Ins. Co., 681 N.E.2d 1274, 1275, 89 N.Y.2d 1057, 1058 (1997) (quoting D. Henderson, Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know, 50 Neb. L. Rev. 415, 418 (1971)).  Washington courts also acknowledge that "when the product is 'not that for which the damaged person bargained,' the damage is the result of an ordinary business risk assumed by the insured" and thus excluded from coverage.  Nat'l Clothing Co., Inc. v. Hartford Cas. Ins. Co., 145 P.3d 394, 398, 135 Wash. App. 578, 586 (Ct. App. 2006) (citing D. Henderson, 50 Neb. L. Rev. 415, 418).  Because no conflict exists, the law of the forum will be applied.

Lastly, in New York an insured may equitably estop an insurer from asserting coverage defenses when the "insurer acts in a manner inconsistent with a lack of coverage, and the insured reasonably relies on those actions to its detriment."  Burt Rigid Box, Inc. v.

Travelers Prop. Cas. Corp., 302 F.3d 83, 95 (2d Cir. 2002).  A showing of prejudice to the insured is also required.  Id.  Likewise, in Washington "insureds must demonstrate that they either suffered prejudice or the insurer acted in bad faith."  Hayden v. Mut. of Enumclaw Ins. Co.,1 P.3d 1167, 1171, 141 Wash. 2d 55, 63 (2000).  Due to the lack of an actual conflict, New York law will be applied.

### C.  Plaintiff's Motion for Summary Judgment

Plaintiff contends the Flow entities are not entitled to coverage under the excess policy.  Instead, it submits the Flow entities must reimburse it the $3,350,000 paid on their behalf to settle the property damage actions.  Lumbermens asserts the Flow entities' liability in those actions arose out of the defective design, manufacture, and installation of the PCS.  Lumbermens argues it should be granted summary judgment because the evidence establishes the PLE and the "your product" exclusion preclude its duty to indemnify the Flow entities in the property damage actions.

Defendants oppose and assert plaintiff has not submitted admissible evidence to prevail on a motion for summary judgment.[15]  Specifically, they contend Lumbermens has not met its burden in proving its entitlement to avoid coverage based on any policy exclusions.  They also argue plaintiff ignores Flow International's lack of involvement in the underlying actions.  This point is discussed further in defendants' motion for summary judgment.

### 1.  First Cause of Action—Professional Liability Exclusion

Lumbermens asserts the PLE applies to preclude coverage for all of the underlying property damage because defendants' engineers engaged in professional services in

---

[15]  They argue plaintiff's exhibits constitute hearsay, but did not make specific objections.  In response, Lumbermens asserts the exhibits are admissible as business records or party admissions.

designing the PCS and thus summary judgment should be granted in its favor on the first

cause of action.  Defendants respond that plaintiff has not presented proof that engineers

were involved in the design or manufacture of the PCS and has not met its burden to show

the PLE applies.

"[T]he insured bears the burden of showing that an insurance coverage covers the

loss, but the insurer bears the burden of showing that an exclusion applies to exempt it from

covering a claim."  MBIA Inc. v. Fed. Ins. Co., 652 F.3d 152, 158 (2d Cir. 2011).

Lumbermens therefore "bear[s] the burden to 'establish that the exclusion is stated in clear

and unmistakable language, is subject to no other reasonable interpretation, and applies in

the particular case.'"  Id. (quoting Cont'l Cas. Co. v. Rapid–Am. Corp., 609 N.E.2d 506, 80

N.Y.2d 640 (1993)).

The PLE bars coverage for damages due to the rendering or failure to render any

professional service.  The focus is on "the nature of the conduct under scrutiny rather than to

the title or the position of those involved as well as to the underlying complaint," Reliance

Insurance Co., 262 A.D.2d at 65 (internal quotations and citation omitted), and whether the

acts or people under consideration involved "the special acumen and training of

professionals when they engaged in the acts challenged," General Insurance Co. of America,

2005 WL 3535113, at *5.

It is undisputed that under the terms of the 1998 Purchase–Sale Agreement, ABB

Autoclave Systems agreed to design, manufacture, distribute, sell, install, and test a PCS

and related equipment in exchange for a fee.  See Pl.'s Statement of Material Facts, Dkt. No.

34–2, ¶ 22.  That agreement also contained the following representations and warranties by

the contractor:

> Contractor represents that it will employ professional engineers, licensed in New York State, to design and stamp all engineering drawings and submittals required to be so stamped by applicable New York law and regulations.  Contractor's design services under this Agreement will be performed in accordance with professional engineering practices, standards and codes and with the skill and diligence of a recognized professional engineer, and in compliance with all applicable federal, state and local laws, codes and regulations in effect as of the date of the Agreement.

See Purchase–Sale Agreement.  Plaintiff notes that in addition to the design services rendered by engineers, defendants also engaged in supervisory and inspection services.

Defendants deny that the Purchase–Sale Agreement required ABB Autoclave Systems to act as an engineer.  See Defs.' Resp. Statement of Material Facts, ¶ 23. Defendants focus on the stamping requirement in the contract.  According to Toops: "[T]he agreement states that professional engineers will be 'employed' if necessary and required under New York law.  In fact, New York was not a 'code state' and engineers' stamps were not required."  Id.  They contend engineers were not used because stamping was not required under New York law.

Despite the disputed facts regarding whether engineers were in fact used by the Flow entities, that determination is not dispositive.  Engineering activities undoubtedly require specialized knowledge and therefore constitute professional services.  Further, based on the Purchase–Sale Agreement and a common sense interpretation of ABB Autoclave System's role in designing, manufacturing, and installing the PCS, it is likely that defendants rendered engineering services, or at a minimum, some kind of professional services to Crucible.

However, whether the property damage was "due to" defendants' rendering or failure to render those professional services cannot be determined on these disputed facts.

The evidence demonstrates that following a thorough investigation into the explosion of the PCS, the cause of the explosion was never established and the underlying property damage lawsuits were settled with no admission of liability.  The Release and Settlement Agreement states that the parties dispute the liability and damages regarding the destruction of the PCS but that in the interests of avoiding the expense and inconvenience of continued litigation, they agree to settle the actions "without any admission of liability, error or wrongdoing whatsoever by any party."  Release and Settlement Agreement, 1.

Plaintiff argues the explosion of the PCS was caused by the Flow entities' failure to design and install a limit switch that could have detected and/or prevented a misalignment; thus the property damage was due to defendants' rendering of professional services in defectively designing the PCS.  Defendants contend the explosion was the result of Crucible's improper maintenance of the PCS; Crucible's repairs on the PCS; or an earthquake in the area prior to the explosion.  Therefore they argue the property damage was not "due to" any of their services, let alone professional services which they assert they did not render.

Lumbermens has not met its burden to demonstrate the PLE applies because the applicability of the exclusion depends on a factual determination of whether the property damage was "due to" defendants' rendering of professional services; particularly whether the damage was due to their failure to design and install a limit switch that could have detected and/or prevented a misalignment.

Because disputed factual issues exist, summary judgment is not appropriate and plaintiff's motion to dismiss the first cause of action will be denied.

### 2. Second Cause of Action—"Your Product" Exclusion

Plaintiff asserts the "your product" exclusion precludes coverage for the loss of the PCS itself and thus summary judgment should be granted in its favor on the second cause of action. Lumbermens maintains the Flow entities' liability in the subrogation action was based in part on the contract price of the lost PCS. It contends the court should allocate between covered and non-covered portions of liability; based on the replacement value of the PCS at $3,450,000, it is entitled to reimbursement of a portion of the $3,350,000 it paid to settle the property damage actions.[16]

Defendants point out that this is a declaratory action and plaintiff cannot seek a money judgment which was never sued for. In reply, plaintiff asserts it demanded repayment of the settlement amounts in its counterclaim in the member case.

As with the PLE, the plaintiff insurer has the burden "of showing that an exclusion applies to exempt it from covering a claim." MBIA Inc., 652 F.3d at 158. Further, because Lumbermens moved for summary judgment, it must establish there are no disputed facts and it is entitled to a judgment that the "your product" exclusion applies as a matter of law. The exclusion provides in relevant part: "This insurance does not apply to property damage to your product arising out of it or any part of it." The phrase "arising out of" is "'ordinarily understood to mean originating from, incident to, or having connection with.'" Turner Constr.

---

[16] Zurich and Travelers paid $5,600,000 in insurance proceeds to Crucible. Plaintiff contends the replacement value of the PCS comprised $3,450,000 of that $5,600,000. According to Lumbermens, it follows that $3,450,000 of the $5,600,000 claim (or 61.6%) asserted by Zurich and Travelers in the subrogation action was for the loss of the PCS. Since the subrogation action was settled for $2,500,000, Lumbermens contends 61.6% of the $2,500,000 settlement—or $1,525,000—must be attributed to the replacement cost of the PCS. It also asserts the $250,000 deductible which formed an item of damages in the Crucible action must be added. Upon finding the "your product" exclusion applicable, plaintiff argues it must be reimbursed $1,525,000 of the $2,500,000 settlement it paid to Travelers and Zurich and $250,000 of the payment to Crucible.

Co. v. Kemper Ins. Co., 198 F. App'x 28, 29 (2d Cir. 2006) (summary order) (quoting

Maroney v. N.Y. Cent. Mut. Fire Ins., Co., 839 N.E.2d 886, 889, 5 N.Y.3d 467, 472 (2005))

(internal quotation marks omitted).  In New York, the phrase "arising out of" in general liability

insurance policies is quite broad.  See, e.g., Liberty Mut. Fire Ins. Co. v. E.E. Cruz & Co.,

Inc., 475 F. Supp. 2d 400, 409 (S.D.N.Y. 2007).

   The parties do not dispute the PCS exploded and the explosion caused damage to

the PCS itself.  Further, defendants acknowledge the vessel misaligned which caused it to

explode.  What is disputed is the cause of the misalignment.  Lumbermens has not met its

burden to demonstrate that this exclusion applies because the application depends on a

factual determination of the cause of the misalignment.  If, as plaintiff contends, the vessel

misaligned because of a poor design, then the damage to the PCS arose out of the product

itself and the exclusion would apply, barring coverage for the loss of the PCS.  However, if

defendants are correct in that some external factor—like an earthquake or improper

maintenance by Crucible—caused the vessel to misalign, the damage to the PCS would not

have arisen out of the product and instead would have originated from another source.  In

that case, there would be coverage.

   Because factual issues exist regarding the applicability of the "your product"

exclusion, summary judgment will be denied.

   **3.  <u>Equitable Estoppel</u>**

   Plaintiff argues defendants should not be able to equitably estop it from asserting

coverage defenses.  Specifically, plaintiff contends it issued multiple reservation of rights

letters to defendants and they have not been prejudiced by its conduct.  Defendants do not

directly respond in opposition, but raise Lumbermens' failure to timely disclaim coverage in

their own summary judgment motion.  This is essentially the same argument.  Specifically, defendants claim that despite plaintiff's awareness of the explosion on June 28, 2002, it failed to disclaim coverage until December 21, 2006.  They contend plaintiff's delay of over four years precludes it from now asserting coverage defenses.

"Estoppel . . . arises where an insurer acts in a manner inconsistent with a lack of coverage, and the insured reasonably relies on those actions to its detriment.  Thus, estoppel requires a showing of prejudice to the insured."  Burt Rigid Box, Inc., 302 F.3d at 95 (internal citations omitted).   Equitable estoppel "applies when an insurer 'unreasonably delays in disclaiming coverage,' as 'judged from the time that the insurer is aware of sufficient facts to issue a disclaimer.'"  U.S. Underwriters Ins. Co. v. Landau, 679 F. Supp. 2d 330, 342 (E.D.N.Y. 2010) (quoting Bluestein v. Chicago Ins. Co., 276 F.3d 119, 122 (2d Cir. 2002)).  However, "[i]f an insurer expressly reserves its rights in communications with the insured, such 'reservations preclude arguments both as to waiver and as to equitable estoppel.'"  Pfeffer v. Harleysville Group, Inc., No. 10–CV–1619, 2011 WL 6132693, at *9 (E.D.N.Y. Sept. 30, 2011) (quoting Globecon Group, LLC v. Hartford Fire. Ins. Co., 434 F.3d 165, 176 (2d Cir. 2006)).

First, any delay must be measured from when Lumbermens was first made aware of sufficient facts to issue a disclaimer.  Defendants argue the clock for Lumbermens' disclaimer began to tick on June 28, 2002, the date of the explosion.  They argue plaintiff participated in the underlying actions from 2002 and if it intended to deny coverage, it was obligated to notify its insured before December 21, 2006.  While the December 21, 2006, letter was officially titled "Disclaimer," that date was not the first time Lumbermens alerted the insureds of its coverage position.  It is undisputed plaintiff issued four letters to defendants or

their representatives.  The parties do not dispute receipt of these letters.  Instead, Leness

testified the letters were overly-inclusive form letters and not reservation of rights letters.

Plaintiff issued its first letter on September 17, 2004.  At that time, the wrongful

death action had been commenced (on March 12, 2004) but neither the subrogation nor

Crucible actions had been initiated yet.  That letter requested more information regarding

potential claims but indicated Lumbermens did not believe it had any obligation under

Coverage Part A because the Federal policy had not been exhausted.  Because the Federal

policy at least potentially applied and Federal was providing a defense, Lumbermens did not

believe it had any obligation under Coverage Part B.

Lumbermens issued a second letter on May 16, 2005, shortly after the subrogation

action (on or about April 12, 2005) and the Crucible action (on or about April 21, 2005) were

commenced.  That letter focused on the subrogation action.  It again explained it had no

coverage obligation under Part A because the Federal policy had not been exhausted.

Because it had received no information indicating Federal had denied coverage in

connection with the subrogation action, it had no coverage obligation under Part B.  Despite

asserting it had no duty to defend at that point, Lumbermens cited policy exclusions

potentially applicable to preclude coverage.  The letter also requested further information

from the insured relating to the subrogation action.

The third letter from Lumbermens, dated July 11, 2006, indicated it was on notice

the Federal policy might be exhausted as a result of a potential settlement in the wrongful

death action.  It agreed to provide a defense in the subrogation action subject to a

reservation of rights.  That letter also referenced the exclusions cited in the previous letters

and reserved the right to later assert coverage defenses.  Thus it appears as of July 11,

2006, Lumbermens was on notice the Federal policy might be exhausted and therefore aware of sufficient facts to issue a disclaimer.

The wrongful death action settled for $1,000,000 on September 1, 2006, exhausting the Federal policy.  As a result, Federal withdrew its defense in the subrogation and Crucible actions on October 2, 2006.  On December 22, 2006, Lumbermens issued its fourth letter titled "Notice of Insurance Coverage Disclaimer and Reservation of Rights."  That letter cited applicable policy provisions including the PLE, the definition of "property damage," and the "your product" exclusion.

Taking July 11, 2006, as the date Lumbermens became aware of facts sufficient to issue a disclaimer, and assuming December 21, 2006, was the date it first disclaimed coverage (despite the multiple earlier letters[17]), Lumbermens waited approximately five months to disclaim.  Even if it were to be concluded that five months is unreasonable, defendants have not established they were prejudiced by the delay.  Their claimed prejudice is that they would have structured the sale to Quintus differently if they were aware that Lumbermens would later assert coverage defenses.  According to the Flow entities, the companies were sold with the understanding that there was more than adequate insurance in place to indemnify for any judgment that may eventually be entered.  That allegation is speculative and insufficient to demonstrate prejudice.  Further, at the time of the sale to Quintus in September 2005, defendants had received at least two letters from Lumbermens citing potentially applicable policy exclusions.

---

[17]  It need not be decided if the earlier letters constituted disclaimers.

Lumbermens has established that defendants cannot prevail on their affirmative defense of equitable estoppel and thus plaintiff's motion on this ground will be granted.

### D.  Defendants' Motion for Summary Judgment

Defendants argue they should be granted summary judgment declaring the policy exclusions do not apply and declaring they are entitled to insurance coverage.  First, they contend Flow International is entitled to a declaration of coverage as it was not involved in the design, manufacture, distribution, or installation of the PCS nor the underlying lawsuits, thus there is no basis for any disclaimer of coverage against Flow International.  Next, defendants argue the second, third, and fourth causes of action must be dismissed because no itemization of damages was made in the settlement and thus judgments cannot be entered for particular items of loss.  They also assert the fifth cause of action, seeking a declaration of no coverage based on the failure to cooperate, must be dismissed because the Flow entities participated in mediation.  Finally, even if the policy exclusions apply, defendants argue plaintiff failed to timely disclaim coverage and is precluded from now doing so.

Lumbermens opposes and contends defendants cannot establish their entitlement to judgment as a matter of law because there are issues of material fact.  Plaintiff contends Flow International is responsible for Flow Autoclave's legal liability and reiterates its argument that Washington law applies; that the PLE and "your product" exclusion apply to preclude coverage; and that the doctrine of estoppel does not apply.

### 1.  Flow International's Involvement

According to defendants, Flow International is a separate and distinct entity that was in no way involved with the underlying Purchase–Sale Agreement with Crucible nor the

manufacture, design, installation, or distribution of the PCS purchased by Crucible.  As a result, Flow International asserts there is no basis for plaintiff to seek a declaration of no coverage as to it, because until this action, Flow International was not involved with the present claims.  Further, the Lumbermens policy contains a "Separation of Insureds" provision which requires that all of the rights and duties under the policy apply separately to each named insured as if each were the only one named.  In accordance with that, defendants maintain coverage must be analyzed for each insured separately; so that even if a policy exclusion applies to one of the Flow entities, it may not apply to Flow International.

Lumbermens contends Flow International is legally responsible for any debts incurred by Flow Autoclave, its joint venture.  Under this premise, once it is determined that the policy exclusions preclude coverage to Flow Autoclave, Flow International must then satisfy the debt.  Further, according to plaintiff, the Flow entities ignore the fact that Flow International retained liability for the Crucible incident in the Purchase–Sale Agreement executed with Quintus in September 2005.  Finally, Lumbermens contends defendants fail to recognize the day-to-day control that Flow International exercised over all of its subsidiaries, including Flow Autoclave.

First, with regard to its ownership of some or all of the Flow entities, Flow International acknowledges it was one of the owners of Flow Autoclave and owned at least half of its shares.  This does not create automatic liability for Flow International.  Next, it is undisputed Flow International was not a party to the underlying Purchase–Sale Agreement with Crucible for the sale of the PCS; it was not a named defendant in the property damage actions; and the settlement in those actions was not paid on its behalf.  Finally, while Flow International agreed to indemnify Quintus for anything related to the Crucible action, that

indemnity agreement was between Flow International and Quintus.  It does not create rights in favor of Lumbermens.

Lumbermens has not demonstrated at this stage that it is entitled to judgment as a matter of law against any of the Flow entities based on policy exclusions.  Nor, for the reasons discussed below, have defendants established as a matter of law the exclusions do not apply and they are entitled to coverage.  The application of the exclusions rest on disputed facts and summary judgment is inappropriate.  Moreover, as defendants point out, this is only a declaratory judgment action and plaintiff has not requested a money judgment, so even if the exclusions apply, Lumbermens cannot demand Flow International satisfy a money judgment on behalf of the other defendants.

Finally, Flow International's legal responsibility for the debts of the Flow entities cannot be determined as a matter of law at this point.  The Quintus Purchase–Sale Agreement alone does not establish Flow International's responsibility for any possible judgment.  The parties have done less than an impressive job explaining the relationship between the named defendants and other related companies.  There are joint ventures, subsidiaries, sales of entire corporations, and multiple owners involved.  Nor has plaintiff presented case law establishing Flow International's legal responsibility for the Flow entities, other than to repeatedly argue that Flow International is legally responsible for any debts incurred by its joint venture, Flow Autoclave.

Accordingly, defendants' motion for summary judgment dismissing Flow International as a defendant will be denied because Flow International's legal accountability cannot be determined and there is no judgment for Flow International to satisfy at this stage of the proceedings.

## 2.  First Cause of Action—Professional Liability Exclusion

Defendants move for summary judgment declaring the PLE does not apply.  The parties make the same arguments discussed above in support of, and in opposition to, this position.

While it is the insurer's burden to show an exclusion applies to exempt it from covering a claim, MBIA Inc.,  652 F.3d at 158, defendants must still carry their burden on summary judgment to establish they are entitled to judgment as a matter of law.  To do so, the Flow entities must demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56; Liberty Lobby, Inc., 477 U.S. at 250, 106 S. Ct. at 2511.  As previously explained, it is disputed whether the property damage sustained at the Crucible plant was due to defendants' rendering of or failure to render professional services to Crucible and thus defendants' motion for summary judgment on this ground will be denied.

## 3.  Second, Third, and Fourth Causes of Action

Defendants argue the second, third, and fourth causes of action must be dismissed because the policy exclusions cited in those claims require a finding that the damages arose out of the insured's product.  Since there has been no such finding, the exclusions cannot entitle plaintiff to a declaration of no coverage.

Plaintiff does not directly respond to this argument but reiterates its position that the property damages stemmed from the PCS and there does not need to be a final determination regarding the cause of the explosion.  Lumbermens argues that even if it is required to establish the damages arose out of the PCS, it is uncontested Flow Autoclave designed, manufactured, and installed the PCS, and the explosion was the proximate cause of the property damage.

- 39 -

The second cause of action seeks a declaration of no coverage for claims arising out of the PCS based on the "your product" and "your work" exclusions.  Because disputed facts preclude a determination as to whether the property damage arose out of the PCS, as required by the exclusions, it cannot be determined as a matter of law that the "your product" exclusion does not apply to bar coverage.  It does not appear defendants argue about the inapplicability of the "your work" exclusion, but even if they did, the result would be the same.  Issues of fact regarding the cause of the misalignment render it impossible to determine as a matter of law whether the property damage arose out of the Flow entities' work as required to find the "your work" exclusion applicable.  Therefore the second claim will remain.

The third cause of action seeks a declaration that no coverage exists for property damage caused by the defendants' work.  This exclusion bars coverage for property damage due to "your work" being incorrectly performed on the damaged property.  Plaintiff contends the Flow entities incorrectly performed work on Crucible's property.  Defendants argue there was never a finding that the Flow entities performed work improperly.  In fact, they allege it was work by Crucible which was performed incorrectly, including Crucible's failure to warn, failure to instruct, negligence in maintaining the system, and failure to properly align the vessels in the system.

In order to grant summary judgment dismissing the third cause of action, there must be an absence of a genuine issue of material fact.  In other words it must not be disputed that the explosion was <u>not</u> due to the defendants' work in designing, manufacturing, installing, or maintaining the PCS.  While defendants are correct there has not been a determination the damage was due to work improperly performed by them, there also has not been a conclusive finding that the damage was <u>not</u> due to work performed by them.

Because factual issues remain regarding the cause of the explosion—particularly whether it was due to incorrect work by the Flow entities—defendants are not entitled to summary judgment dismissing this claim.  Thus the third claim will remain for trial.

Finally, the fourth cause of action seeks a declaration that no coverage exists for claims arising out of the loss of intangible property, business interruption, or lost profits.  The complaint alleges Lumbermens is not obligated to provide coverage for such loss because the policy definition of property damage includes only tangible property.  Defendants argue this claim must be dismissed on summary judgment because the settlement did not allocate between types of loss—there were no specific items of damages and thus recovery cannot be divided between intangible and tangible property loss.

Because the Release and Settlement Agreement did not allocate between types of loss—for example property damage versus lost profits—it is impossible to know how much, if any, of the $3,350,000 settlement was based on lost profits, claims expenses, loss mitigation, attorneys' fees, clean-up costs, business interruption, extra-expense, delay damage, or the performance of extra work.  Accordingly, defendants' motion for summary judgment dismissing the fourth cause of action will be granted.

### 4.  <u>Fifth Cause of Action—Failure to Cooperate Provision</u>

Defendants contend plaintiff's fifth cause of action, seeking a declaration that no coverage exists due to their failure to cooperate, must also be dismissed because they participated in mediation.  That claim asserts "Lumbermens has repeatedly requested that the Flow entities participate with it in a mediation with Crucible, Zurich and Travelers and contribute its own funds towards a possible global settlement."  Compl. ¶ 90.  Further, defendants argue summary judgment must be granted on this claim in favor of Flow

International because it had no obligation to mediate as it was not a named defendant in the underlying suits.  Plaintiff did not respond to this argument.

It is undisputed the parties, except Flow International, participated in mediation in December 2008 and the property damage actions settled as a result.  Further, as Flow International was not a named defendant in the subrogation or Crucible actions, it had no duty to mediate.  Accordingly, summary judgment will be granted and plaintiff's fifth cause of action will be dismissed.

### 5.  <u>Untimely Disclaimer</u>

Finally, defendants argue that even if the policy exclusions apply, Lumbermens failed to disclaim coverage for four years after learning about the explosion and has waived any right to now do so.  While this is similar to the equitable estoppel argument discussed above, defendants base their motion on the notice requirements in New York Insurance Law section 3420.  Section 3420 requires an insurer to disclaim as soon as reasonably possible for coverage for death or bodily injury.  <u>See</u> N.Y. Ins. Law § 3420(d).  That section does not apply to claims for property damage.  <u>See, e.g.</u>, <u>Landau</u>, 679 F. Supp. at 342.

This matter does not involve a claim for death or bodily injury; it involves a claim for property damage.  While this matter derives from other lawsuits, including a claim for the death of a Crucible employee, the wrongful death claim is not the subject of this litigation.  The wrongful death claim was not a part of the underlying subrogation and Crucible actions, nor was it a part of the Release and Settlement Agreement nor the settlement paid by Lumbermens, which collectively form the basis for this declaratory judgment action.  The subrogation and Crucible actions do not seek to recover for any type of death or bodily injury.  Therefore the strict provisions of section 3420(d) do not apply, and plaintiff's failure to

promptly disclaim does not automatically preclude it from relying upon coverage defenses. See Only Natural, Inc. v. Realm Nat'l Ins. Co., 37 A.D.3d 436, 439 (N.Y. App. Div. 2d Dep't 2007) (finding the unexplained failure of defendants to promptly disclaim did not automatically estop them from relying upon defenses because matter did not involve death or bodily injury claim); Judlau Contracting, Inc. v. Westchester Fire Ins. Co., No. 100529/2005, 2009 WL 2356887, at *5 (N.Y. Sup. Ct. July 21, 2009) ("The requirement of a prompt disclaimer, pursuant to Insurance Law 3420(d), applies only to actions for personal injury, not property damage claims.").

Because defendants cannot rely on section 3420, they must invoke the doctrine of equitable estoppel to prevent plaintiff from asserting coverage defenses. Landau, 679 F. Supp. 2d at 342 ("Although § 3420(d)(2) does not apply to claims for property damage, disclaimers under those circumstances may nonetheless be waived pursuant to common law equitable estoppel.").  As explained above, defendants have not demonstrated they were prejudiced simply because of speculation that a business deal might have been structured differently.  Because they cannot establish prejudice, they cannot invoke common law equitable estoppel.

Accordingly, defendants' motion to preclude plaintiff from relying on coverage defenses because of an untimely disclaimer will be denied.

## IV.  **CONCLUSION**

There is no basis on which to conclude that Lumbermens waived the choice of law argument.  However, after determining there are no actual conflicts between the laws of Washington and the laws of New York with respect to each issue, the law of the forum will be applied.

Turning to plaintiff's motion for summary judgment, it has not met its burden to demonstrate the absence of a genuine issue of material fact as to the applicability of the PLE.  Because the exclusion rests on a factual determination of whether the property damage was due to defendants' rendering of professional services, summary judgment dismissing the first cause of action will be denied.  Nor has Lumbermens established that the "your product" exclusion applies to bar coverage.  Instead, the parties seriously contest the cause of the vessel misalignment, and thus it is impossible to determine as a matter of law whether the property damage arose out of the PCS.  Finally, because defendants have not shown they were prejudiced by any delay in Lumbermens' disclaimer, plaintiff's request to dismiss defendants' affirmative defense of equitable estoppel will be granted.

With respect to defendants' motion for summary judgment, they have not presented sufficient evidence showing that Flow International has absolutely no legal accountability for any of the causes of action asserted in the complaint.  Further, such a determination is premature as there is no judgment for Flow International to satisfy at this time.  Next, as with plaintiff's argument regarding the PLE, factual issues exist regarding whether the property damage sustained at the Crucible plant was due to defendants' rendering of or failure to render professional services to Crucible.  Additionally, as the cause of the misalignment was never determined and the parties dispute the same, it cannot be determined as a matter of law that the property damage arose out of, or did not arise out of, the Flow entities' work.  Likewise, defendants have not demonstrated the absence of a genuine issue of material fact with regard to whether the property damage was due to incorrect work by the Flow entities.  Thus defendants' motion for summary judgment dismissing the second and third causes of action will be denied.  Turning to the fourth cause

of action, summary judgment will be granted dismissing this claim because the Release and Settlement Agreement did not allocate between types of loss.  The fifth cause of action will also be dismissed upon defendants' request because the involved parties participated in mediation in December 2008 and the actions settled as a result.  Lastly, defendants' final ground for summary judgment will be denied because New York Insurance Law section 3420 does not apply and defendants cannot rely on common law equitable estoppel.

Therefore, it is

ORDERED that

1.  Plaintiff Lumbermens Mutual Casualty Company's motion for summary judgment is GRANTED in part and DENIED in part;

(a) Summary judgment declaring the professional liability exclusion applicable is DENIED;

(b) Summary judgment declaring the "your product" exclusion applicable is DENIED;

(c) Summary judgment striking defendants' affirmative defense of equitable estoppel is GRANTED;

2.  Defendants Flow International Corporation, Flow Autoclave Systems, Inc., Flow Pressure Systems, ABB Pressure Systems, Avure Technologies AB, and Avure Technologies, Inc.'s motion for summary judgment is GRANTED in part and DENIED in part;

(a) Summary judgment dismissing Flow International Corporation is DENIED;

(b) Summary judgment declaring the professional liability exclusion inapplicable is DENIED;

(c) Summary judgment declaring the "your product" and "your work" exclusions inapplicable is DENIED;

(d) Summary judgment declaring the "your work" exclusion for incorrectly performed work inapplicable is DENIED;

(e) Summary judgment dismissing the fourth cause of action is GRANTED;

(f) Summary judgment dismissing the fifth cause of action is GRANTED; and

(g) Summary judgment declaring plaintiff's disclaimer untimely is DENIED.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  February 17, 2012
        Utica, New York.

The following claims in the lead case remain for trial:

(a) First Cause of Action, seeking a declaration that no coverage exists due to the professional liability exclusion;

(b) Second Cause of Action, seeking a declaration that no coverage exists for claims arising out of the loss of the pressurized containment system; and

(c) Third Cause of Action, seeking a declaration that no coverage exists for property damage caused by the Flow entities' work.

No motions were made with regard to the member case.  In view of the above decision in the lead case, subject to further clarification or agreement among counsel, the following claims and counterclaims in the member case remain for trial:

(a) First Cause of Action, alleging Lumbermens and Kemper's breach of contract by refusing to defend the Flow entities in the property damage actions;

(b) Second Cause of Action, seeking a declaration that Lumbermens is obligated to indemnify the plaintiffs in the property damage actions;

(c) Third Cause of Action, seeking attorneys' fees and disbursements resulting from Lumbermens and Kemper's alleged breach of contract;

(d) First Counterclaim, seeking a declaration that no coverage exists due to the professional liability exclusion;

(e) Second Counterclaim, seeking a declaration that no coverage exists for claims arising out of the loss of the pressurized containment system; and

(f) Third Counterclaim, seeking a declaration that no coverage exists for property damage caused by the Flow entities' work.